IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| BRIAN GORSLINE, DAWN GORSLINE, PAUL BATKOWSKI AND MICHELE BATKOWSKI | : | No. 67 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court dated September |
| | : | 14, 2015 at No. 1735 CD 2014 |
| v. | : | Reversing the Order of the Lycoming |
| | : | County Court of Common Pleas, Civil |
| | : | Division, dated August 29, 2014 at No. |
| BOARD OF SUPERVISORS OF | : | 2014-0130 |
| FAIRFIELD TOWNSHIP | : | |
| | : | ARGUED:  March 8, 2017 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| INFLECTION ENERGY, LLC AND | : | |
| DONALD SHAHEEN AND ELEANOR | : | |
| SHAHEEN, HIS WIFE | : | |
| | : | |
| | : | |
| APPEAL OF:  BRIAN GORSLINE, DAWN | : | |
| GORSLINE, PAUL BATKOWSKI AND | : | |
| MICHELE BATKOWSKI | : | |


**OPINION**


**JUSTICE DONOHUE**                                              **DECIDED: June 1, 2018**

In this discretionary appeal, we consider whether the Commonwealth Court erred

in reversing the decision of the Lycoming County Court of Common Pleas, which, in

turn, had reversed the decision of the Fairfield Township Board of Supervisors (the

"Board") to allow for the drilling, construction, development and operation of

unconventional natural gas wells as a conditional use in a district zoned Residential-

Agricultural ("R-A").[1] As the evidentiary record in this case does not support the Board's decision, and because the proposed use is not similar to any permitted use in the R-A district,[2] as required under the Fairfield Township Zoning Ordinance (the "Ordinance"), we reverse the decision of the Commonwealth Court.

Section 3.1 of the Ordinance defines an R-A district as follows:

> This District is generally intended for application to rural development areas where public and sewer facilities are not presently available and may not be available in the near or immediate future. The purpose of the regulations for this district is to foster a quiet, medium-density residential environment while encouraging the continuation of agricultural activities and the preservation of prime farmland. To this end, lot sizes are based upon the need to safeguard the health of the citizens by requiring ample space for the placement of on-lot sewage and water facilities, but yet providing for reduction of these minimum requirements where public sewer and/or water systems are developed. Industrial uses are discouraged in this district; compatible public and semi-public uses such as schools, churches, and recreational facilities are provided for; and higher density

---

[1] The natural gas wells in this case were being constructed to extract natural gas from Marcellus Shale. This is done by hydraulic fracturing, more commonly known as "fracking." As we previously explained in *Robinson Twp. v. Commonwealth*, 147 A.3d 536 (Pa. 2016) ("*Robinson II*"), fracking involves "pumping at high pressure into the rock formation a mixture of sand and freshwater treated with a gel friction reducer, until the rock cracks, resulting in greater gas mobility." *Id.* at 543 n.4 (quoting *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 914-15 (Pa. 2013) (plurality) ("*Robinson I*")). In *Robinson I*, a plurality of this Court described fracking operations as an industrial use involving "air, water, and soil pollution; persistent noise, lighting, and heavy vehicle traffic; and the building of facilities incongruous with the surrounding landscape." *Robinson I*, 83 A.3d at 979. In a concurring opinion, Justice Baer was even more descriptive, explaining that "these industrial-like operations include blasting of rock and other material, noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials, constant bright lighting at night, and the potential for life-and property-threatening explosions and gas well blowouts." *Id.* at 1005 (Baer, J., concurring).

[2] The Ordinance divides Fairfield Township, Lycoming County, into three zoning districts: R-A, General Commercial, and Industrial. *See* Ordinance, § 3.1.

residential development may be permitted under certain conditions.

*Id.*

Inflection Energy, LLC ("Inflection") submitted to the Board a "Zoning and Development Permit Application" (the "Application") seeking permission for a "drilling, completion, production and operation of multiple gas wells" use on a 59.877-acre parcel of land located on Quaker State Road in Montoursville, Pennsylvania and owned by Donald and Eleanor Shaheen (the "Shaheen Pad"). Application, ¶ 4. The Shaheen Pad is located in Fairfield Township's R-A district. The Application proposed to improve the existing farm access road with a stone access drive from Quaker State Road/T-855 to the pad site, a level pad, well head, and a temporary water impoundment area with sediment and erosion controls.

Because the Ordinance does not identify "drilling, completion, production and operation of multiple gas wells" as a permitted or conditional use[3] in the R-A district, the township zoning officer referred Inflection's Application to the Board for further

---

[3] Permitted uses in an R-A district include: accessory uses or structures; agriculture; single-family detached dwellings; essential services (which require no permit); family-based group homes; family daycare homes; forestry activities; home occupation; hunting camps or seasonal dwellings; and "no impact" home-based businesses. Ordinance, § 4.2.1. Conditional uses that are allowed in an R-A district include: agricultural businesses; bed and breakfast inns; cluster subdivision or planned residential development; daycare centers; multi-family dwellings; multi-family housing developments; townhouses; two-family dwellings; funeral homes; group care facilities; hospitals, hospital administration and support uses; manufactured or mobile home parks; nursing, retirement or assisted living facilities; parking lots and garages; professional offices; public service facilities or public or quasi-public uses; commercial recreation; and public recreation. *Id.*, § 4.2.2; *see also id.*, § 12.1 (setting forth general criteria that apply to conditional uses).

consideration pursuant to section 12.18 of the Ordinance, sometimes referred to as its

"savings clause." Section 12.18 provides in full as follows:

> Whenever, under this Ordinance, a use is neither specifically permitted [n]or denied, and an application is made by an applicant to the Zoning Officer for such a use, the Zoning Officer shall refer the application to the Board of Supervisors to hear and decide such request as a conditional use. The Board of Supervisors shall have the authority to permit the use or deny the use in accordance with the standards governing conditional use applications set forth in Section 14.2 of this Ordinance. In addition, the use may only be permitted if:
>
> > **12.18.1** It is similar to and compatible with the other uses permitted in the zone where the subject property is located;
> >
> > **12.18.2** It is not permitted in any other zone under the terms of this Ordinance; and
> >
> > **12.18.3** It in no way is in conflict with the general purposes of this Ordinance.
>
> The burden of proof shall be upon the applicant to demonstrate that the proposed use meets the foregoing criteria and would not be detrimental to the public health, safety and welfare of the neighborhood where it is to be located.

Ordinance, § 12.18.

The central issue in this appeal is whether the Board erred in finding, and the Commonwealth Court erred in affirming, that Inflection satisfied the requirement in subsection 12.18.1 that the proposed use was "similar to" other uses allowed in the R-A district. In its Application, Inflection did not identify any use allowed in the R-A district that it considered to be "similar to" the drilling and operation of industrial shale gas wells.

At the first of two public hearings on Inflection's Application, Inflection presented Thomas Erwin ("Mr. Erwin"), its senior field operations manager, as an expert in the

design, permitting and development of natural gas wells. Mr. Erwin testified that the Shaheen Pad would be 300 by 350 feet in size during drilling and completion of the gas wells, and after drilling and completion it would be reduced to approximately 150 by 150 feet. N.T., 10/7/2013, at 12. He described the property as being used to farm corn, unimproved by houses, and including a stream and wetlands. *Id.* at 10-11. There was one residence within 1000 feet of the Shaheen Pad and over 125 residential drinking water wells and a large residential development within 3000 feet of the pad. *Id.* at 23-24. Mr. Erwin was uncertain as to how many gas wells would ultimately be drilled on the Shaheen Pad. He believed it likely that two wells would be drilled initially, and depending on the results, Inflection could subsequently drill more. *Id.* at 12-13. He testified that Inflection would also construct a two-million-gallon water impoundment area and an eight- by twelve- by twenty-foot building to house a separator. *Id.* at 13, 15.

Mr. Erwin testified that Inflection had received approval for four other gas wells in the R-A district in Fairfield Township, but provided no other information about these wells or the approval process related thereto. *Id.* at 20. A neighboring resident, however, testified to her knowledge that the other wells were "much further from residential areas" than the proposed Shaheen Pad – testimony the Board found to be credible. N.T., 11/4/2013, at 67; *see* Board Op., Findings of Fact, ¶ 42.

With respect to the issue of similarity of use in connection with subsection 12.18.1 of the Ordinance, counsel for Inflection asked Mr. Erwin two questions regarding whether Inflection's proposed use may constitute a "Public Service Facility" use. The Ordinance, which permits "Public Service Facility" uses (as conditional uses) in all three of Fairfield's zoning districts, defines the term as follows:

> The erection, construction, alteration, operation or maintenance of buildings, power plants or substations, water treatment plants or pumping stations; sewage disposal or pumping plants and other similar public service structures by a utility, whether publicly or privately owned, or by a municipal or other governmental agency, including the furnishing of electrical, gas, communication, water supply and sewage disposal services.

Ordinance, § 2.2. In response to counsel's questions, Mr. Erwin offered the following contradictory responses:

> [Counsel for Inflection]: And what is the proposed use in that district? What do you plan on --
>
> [Mr. Erwin]: Oil and gas development.
>
> [Counsel for Inflection]: And is that proposed use classified as a public service facility under the [O]rdinance?
>
> [Mr. Erwin]: No.
>
> [Counsel for Inflection]: It fits the definition as a public service facility under the Fairfield Township Zoning Ordinance, is that correct?
>
> [Mr. Erwin]: Yes.

N.T., 10/7/2013, at 8. Mr. Erwin was not asked to explain his inconsistent answers, including how the proposed use could not be classified as a "public service facility," yet simultaneously met the Ordinance's definition of that term. Mr. Erwin offered no other testimony relevant to the similarity of use issue.

At the second hearing, in response to questions posed by members of the public that were beyond the scope of Mr. Erwin's expertise and knowledge, Inflection presented geologist Thomas Gillespie, its director of regulatory affairs and environmental and health safety, as an expert in water resources and gas development.

N.T., 11/4/2013, at 6. Mr. Gillespie offered no testimony or evidence relevant to the similarity of use issue.

At both evidentiary hearings, neighboring residents, many of whom were knowledgeable about oil and gas development activities (either from working in the industry or from their familiarity with other wells), cross-examined Inflection's two witnesses (Mr. Erwin and Mr. Gillespie) and also testified in opposition to Inflection's Application. The residents offered testimony regarding the negative impact the proposed use would have on those who lived near the Shaheen Pad; the absence of criminal background checks for nearly all of the individuals working on the Shaheen Pad; sediment control; the potential for a "controlled kick;"[4] the lack of protections for the neighboring residents' drinking water and wetlands; prior DEP citations received by Inflection and other companies conducting fracking activities in the area; the potential for earthquakes; and a study by researchers from Duke University concluding that Pennsylvania's waterways contain excess levels of radioactivity because of fracking activities. *See id.* at 45-46, 78-79; N.T., 11/4/2013, at 14, 32, 36, 38, 42, 45-48, 57; *see also* Gorsline Exhibit-1.

The Board approved the Application by a two-to-one vote, granting Inflection a conditional use permit for its proposed gas wells use, contingent upon Inflection's compliance with certain conditions designed to minimize the harmful effects of the drilling. The Board found that Inflection's proposed use was not an allowed use in any

---

[4] A "controlled kick" is the burning of excess gas at a well that has "flames shooting out the top." N.T., 10/7/2013, at 38. The testifying resident had observed this occurring at another gas pad operated by Inflection. *Id.* Mr. Erwin stated that Inflection did not "anticipate doing it" at the Shaheen Pad, but acknowledged that Inflection "did not anticipate doing that" at the other facility either. *Id.*

of the township's three zoning districts and was thus governed by the savings clause in section 12.18. The Board broadly found, without explication or explanation, "that the criteria for review set forth in Section[] 12.18 … [has] been sufficiently satisfied[.]" Board Op., Conclusions of Law, ¶¶ 3, 20. The Board made no specific findings in support of this conclusion of law, and with respect to subsection 12.18.1, it neither referenced the subsection nor identified any permissible use in the R-A district that it found to be similar to the use proposed by Inflection.

Brian Gorsline, Dawn Gorsline, Paul Batkowski and Michele Batkowski (collectively, "Objectors"), local residents of the Pines Development in Fairfield Township, appealed the Board's decision to the Lycoming County Court of Common Pleas. *See* 53 P.S. 11002-A(a) (providing for land use appeals to be taken to the court of common pleas in the judicial district in which the land is located). The trial court held oral argument but did not take any additional evidence. The trial court first acknowledged that its standard of review with respect to zoning decisions when it does not take additional evidence is that the findings of the governing body below "shall not be disturbed by the court if supported by substantial evidence." *Gorsline v. Bd. of Supervisors of Fairfield Twp.*, 40 Pa.D&C.5d 478, 482 (C.P. Lycoming 2014) (citing 53 P.S. § 11005-A). With respect to similarity of uses (subsection 12.18.1), Inflection argued to the trial court that its drilling operation constituted a "public service facility." Citing to a lack of substantial evidence to support this conclusion, the trial court disagreed and reversed the Board's decision. *Id.* at 486-89. The trial court observed that the Board had offered no explanation regarding the manner in which Inflection's proposed fracking use was "similar to" a "public service facility," and noted that Inflection

would not be providing any public service, as it "is not constructing these wells to furnish natural gas to the residents of the Pines Development, or even Fairfield Township." *Id.* at 489-90.[5]

Inflection and the Shaheens (collectively referred to as "Inflection") appealed to the Commonwealth Court.[6] Referencing the Board's "detailed findings of fact," but citing to none, the Commonwealth Court found that the common pleas court erred in concluding that Inflection had not met its burden of proof on the question of whether the proposed use was similar to permitted uses in an R-A district under section 12.18.1. *Gorsline v. Bd. of Supervisors of Fairfield Twp.*, 123 A.3d 1142, 1151 (Pa. Commw. 2015). Instead, the intermediate appellate court found that Inflection's proposed use was similar to and compatible with a "public service facility" use and/or an "essential service" use based on its prior decision in *MarkWest Liberty Midstream & Resources, LLC v. Cecil Twp. Zoning Hrg. Bd.*, 102 A.3d 549 (Pa. Commw. 2014) ("*MarkWest*"), which it found to be "directly on point." *Gorsline*, 123 A.3d at 1151-52.

In *MarkWest*, the applicant filed an application for a special exception to operate a natural gas compressor station in Cecil Township's (Washington County) light industrial district. *MarkWest*, 102 A.3d at 553. The local zoning ordinance provided that in order for MarkWest to obtain the special exception, it had to show that its use, *inter*

---

[5] The trial court further found, based on the evidence presented before the Board, that the evidence was insufficient to support the Board's finding that the proposed use would "in no way" conflict with the general purposes of the Ordinance as required by section 12.18.3 and that there was substantial evidence presented that "the use will adversely affect the health, welfare and safety of the neighborhood." *See Gorsline*, 40 Pa.D.&C.5th at 490-503.

[6] The Board did not appeal the decision, but filed a brief in support of Inflection.

alia, was "of the same general character" as uses permitted in the light industrial district. *Id.* at 554. In its application, MarkWest asserted that its use was "of the same general character" as an "essential service" use, as defined by the local ordinance. *Id.* The record before the zoning board in *MarkWest* established that the proposed use was for the collection and transmission of natural gas to market – the company would not be drilling (fracking). *Id.* at 552 n.2, 557. The zoning hearing board denied the application; MarkWest appealed the decision and the Commonwealth Court reversed. The Commonwealth Court found that the phrase "of the same general character" in the ordinance did not require a level of similarity approaching an identity of uses, and was instead satisfied if the two uses were of the same "general" character. According to the Commonwealth Court, the natural gas compressor station use at issue was sufficiently similar to an "essential service" use and/or a "public service facility" use, as all three involved public facility uses furnishing gas service to the public pursuant to public regulation. *Id.* at 558-59.

In the case sub judice, the Commonwealth Court found that the Ordinance's definitions of "public service facility" and "essential services"[7] were similar to the definitions of the same terms in the ordinance at issue in *MarkWest*. *Gorsline*, 123 A.3d at 1152. It thus concluded, without elaboration or reference to any evidence of record, that "[p]recisely as in *MarkWest*, Inflection's proposed use satisfies the requirement set forth in 12.18.1 of the Zoning Ordinance that it 'is similar to and compatible with other

---

[7] The Ordinance defines "essential services" as: "Public utility facilities that do not require enclosure in building, including gas, electrical, steam, telephone, or water distribution systems; and including related equipment such as poles, towers, wires, mains, sewers, pipes, conduits, cables, fire alarm boxes, police call boxes, traffic signals, hydrants, and other similar equipment." Ordinance, § 2.2.

uses permitted in the zone where the subject property is located.'"[8]  *Id.*  The

Commonwealth Court further held, again without discussion or citation to the record,

that Inflection's evidence "was in no way rebutted, and the Board has already

authorized Inflection's other wells in the R[-]A District."  *Id.*

Objectors filed a petition for allowance of appeal to this Court, which we granted

to address the following:

> (1) Does the Commonwealth Court's decision below, that an
> industrial shale gas development is similar to and compatible
> with uses expressly permitted in a[n] R-A District, conflict
> with this Court's decision in *Robinson [I]*?
>
> (2) Did the Commonwealth Court commit an error of law in
> deciding that an industrial shale gas development is similar
> to and compatible with a "public service facility" in an R-A
> District when the Township made no factual finding or legal

---

[8]  In reversing the trial court's determination that Inflection had also failed to prove that its proposed use was in conflict with the general purposes of the Ordinance, as required by section 12.18.3, the Commonwealth Court indicated that no such conflict existed because the Ordinance "expressly authorizes the extraction of minerals."  *Gorsline*, 123 A.3d at 1152.  In so ruling, however, the Commonwealth Court cited to the definition of a "rural resource area," noting that the definition of this term refers to "mining, quarrying and other extractive industries."  *Id.* at 1152 & n.10.  While the Ordinance defines the term, however, it does not designate any of the township's zoning districts as a "rural resource area."

The Commonwealth Court also cited section 603(i) of the Municipalities Planning Code, which requires the "reasonable extraction of minerals," 53 P.S. § 10603(i).  This requirement is apparently satisfied in the Ordinance pursuant to its allowance of "surface mining" as a conditional use in the Industrial district.  Ordinance, § 6.2.3.12.  Before the trial court, Objectors attempted to argue that Inflection could not seek a conditional use permit under the Ordinance's savings clause (section 12.18) because the Ordinance's definition of "surface mining" permitted the extraction of "minerals" and defined "minerals" to include "oil and natural gas."  Ordinance, § 2.2.  The trial court ruled, however, that "surface mining" did not include the drilling of underground mine openings, as Inflection proposed to do, and thus agreed with the Board that Inflection's proposed gas wells use was not allowed in any of its zoning districts (and thus subject to approval pursuant to the savings clause in section 12.18).  *Gorsline*, 40 Pa.D&C.5d at 478.  The parties did not appeal this ruling to the Commonwealth Court.

conclusion to that effect, the record contains no substantial evidence to support that determination and the company's own witness testified that shale gas development was **not** similar to a "public service facility" in an R–A District?

(3) Did the Commonwealth Court improperly decide that *MarkWest* [], wherein it held that a compressor station is similar to and compatible with a "public service facility" in a Light Industrial District, also compels the conclusion that an industrial shale gas development is similar to and compatible with a "public service facility" in an R-A District designed for quiet, residential development and not industrial land uses?

(4) Did the Commonwealth Court commit an error of law by relying on prior conditional use approvals that the Township issued for uses not expressly permitted in the R-A District, in order to support its decision that an industrial shale gas development is similar to and compatible with uses expressly permitted in the R-A District?

*Gorsline v. Bd. of Supervisors of Fairfield Twp.*, 139 A.3d 178 (Pa. 2016) (per curiam) (emphasis original).

We address the final three issues raised by Objectors, which are interrelated and, we conclude, dispositive of this case. Because we may decide this case on non-constitutional grounds, we decline to decide Objectors' first issue, relating to this Court's decision in *Robinson I* based on a claimed violation of substantive due process rights and the Environmental Rights Amendment of the Pennsylvania Constitution (Article I, Section 27). *See Blake v. State Civil Serv. Comm'n*, 166 A.3d 292, 297 (Pa. 2017) (recognizing that constitutional questions should not be decided if the case can be resolved on alternative, non-constitutional grounds).

In their brief filed with this Court, Objectors assert that the Board made no findings of fact with respect to the requirements of subsection 12.8.1, and instead reached the bald conclusion that Inflection somehow satisfied its burden of proof without

identifying any similar permitted use in the R-A district. Objectors' Brief at 23, 28. Objectors contend that the record does not support the Commonwealth Court's conclusion that the propose use is similar to a "public service facility" use, and note that this was a legal conclusion made in the first instance by the Commonwealth Court, not the Board. *Id.* at 24. Inflection did not identify any similar use in its 170-page Application, and the only evidence presented to the Board regarding a potentially similar use ("public service facility") was Mr. Erwin's response to a leading question, which directly contradicted his prior response to essentially the same question. *Id.* at 24-26.

Objectors state that the Commonwealth Court's conclusion that *MarkWest* was controlling in this matter was error because it addressed a proposed use in a different zoning district that had a very different purpose.[9] *Id.* at 29-33. Further, to the extent the Commonwealth Court relied on the conditional use permits the Board previously granted for four other gas wells in the R-A district, Objectors assert that this too was error, as such reliance would effectively amend the Ordinance to allow for gas development in the R-A district without requiring Inflection to meet its burden of proof under the savings clause for a use not authorized in the district. *Id.* at 34-38.

---

[9] The Delaware Riverkeeper Network, Clean Air Council, and Environmental Integrity Project ("Environmental Amici") and Peters Township, South Fayette Township, David M. Ball, and Brian Coppola ("Township Amici"), advance arguments, inter alia, in support of Objectors' claim that the Commonwealth Court's reliance on *MarkWest* was error. Environmental Amici argue that Commonwealth Court's reliance on *MarkWest* was erroneous because of the differences between (1) the ordinances at issue, (2) the activities (mineral extraction vs. facilitation of transport/processing of minerals), and (3) the districts themselves (light industrial vs. R-A). Environmental Amici's Brief at 33-34. Further, Environmental Amici note that the *MarkWest* court "relied heavily on an analysis of the testimony and the ordinance provisions," while the Commonwealth Court in the case at bar failed to do so entirely. *Id.* at 34-35. Township Amici advocate for this Court to reverse the decision in *MarkWest*, contending that the holding should be invalidated as "simply incorrect." *See* Township Amici's Brief at 29-33.

Inflection and the Board, conversely, both assert that the Commonwealth Court's decision is fully supported by the record and applicable law.[10] Inflection asserts that the Commonwealth Court's reliance on *MarkWest* was proper because of the similarity between the cases:  both involved an application for a permit under the respective ordinance's savings clause; both ordinances required a consideration of similarity between the proposed use and the uses permitted in the zone; and the ordinances

---

[10]  *See* Board's Brief at 9 (adopting Inflection's brief on the issues addressed in this Opinion "in its entirety").

Amicus briefs in support of the Board and Inflection were filed by: (1) Robinson Township, Washington Township, and Mount Pleasant Township; (2) the County of Beaver, the County of Allegheny, and Rich Fitzgerald; (3) Pennsylvania State Association of Township Supervisors; (4) the Greater Pittsburgh Chamber of Commerce, the Washington County Chamber of Commerce, the Williamsport/Lycoming Chamber of Commerce, and the Pennsylvania Chamber of Business and Industry, (5) the International Union of Operating Engineers, Local 66 and the International Brotherhood of Electrical Workers, Locals 5, 81, 163, 712 and 812 ("Union Amici"); (6) Laborers' District Council of Western Pennsylvania; (7) the Marcellus Shale Coalition; (8) the Pennsylvania Independent Oil & Gas Association; and (9) the American Petroleum Institute.  The majority of the arguments advanced by these amici support points made by the Board and Inflection in their briefs that do not pertain to the question of the similarity of uses or they raise new arguments not advanced by the parties in support of affirming the Commonwealth Court's decision.

Of relevance to the determinative question in this appeal, the Pennsylvania Independent Oil & Gas Association asserts that natural gas production is similar to a "public service facility" and identifies numerous consumer products that depend on oil and gas production. Pennsylvania Independent Oil & Gas Association's Brief at 9 & Appendix B. Union Amici assert that the Commonwealth Court correctly found that Inflection's proposed use was similar to a "public service facility" based on Mr. Erwin's testimony stating the same.  Union Amici's Brief at 4-5.  Union Amici further support the Commonwealth Court's reliance on *MarkWest* because in both instances, "the applicants demonstrated that their proposed uses were similar to other uses that were expressly permitted in the district at issue.  *Id.* at 6 (citing *MarkWest*, 102 A.3d at 556). Lastly, Union Amici state that the Commonwealth Court did not base its decision solely on the fact that the Board had previously granted conditional use permits for gas wells, and that this evidence was properly considered because it corroborated the conclusion that the Board conducted the requisite analysis here. *Id.* at 7.

contained identical definitions of what constitute "public service facility" and "essential services" uses. Inflection's Brief at 29. Inflection further asserts that its proposed use in this case is similar to uses that are permitted by the Ordinance in an R-A district, including a "public service facility" use and an "essential services" use. *Id.* at 38. In so arguing, Inflection states that its proposed use will "serve the general public producing and piping natural gas to the public for their use and consumption." *Id.* at 39. Finally, Inflection argues that its proposed use is "identical to" other natural gas wells that have been granted conditional use permits by the Board within the R-A district, thus demonstrating that the Board, in reaching its decision in this case, "reasoned that the proposed use is 'similar and compatible with the other uses permitted in the zone.'" *Id.* at 36.

Whether a proposed use falls within a given category specified in a zoning ordinance is a question of law. *Southco, Inc. v. Concord Twp.*, 713 A.2d 607, 609 (Pa. 1998). Thus, appellate review is limited to determining whether the lower court committed an error of law. *Id.* As with all questions of law, our standard of review is de novo and our scope of review is plenary. *See Buckwalter v. Borough of Phoenixville*, 985 A.2d 728, 730 (Pa. 2009). We may only disturb the Board's factual determinations if they are not supported by substantial evidence, and by "substantial evidence" we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 642 (Pa. 1983).

Based upon our review of the record in this case, we must conclude that the trial court correctly applied its standard of review in finding that the Board's decision to grant

Inflection's Application was not supported by substantial evidence. With respect to similarity of use, the trial court held that Inflection's limited testimony on this issue (from Mr. Erwin) was "conclusory and not supported by any factual evidence whatsoever." *Gorsline*, 40 Pa.D&C.5d at 488.

> [Mr. Erwin] testified that Inflection's proposed use was **not** classified as a public service facility under the Ordinance. Transcript, 10/7/13, at 8. Apparently dissatisfied with that answer, Inflection's counsel then asked the following leading question, "It fits the definition as a public service facility under the Fairfield Township Zoning Ordinance, is that correct?" After this prompting, [Mr. Erwin] said, "Yes." There was absolutely no explanation for [Mr. Erwin's] arguably inconsistent answers. The definition of a public service facility was not discussed or alluded to and no testimony was provided to show how Inflection's proposed use fits the definition. There was just a bald, conclusion statement that the use fit the definition of a public service facility.

*Id.* at 489 (emphasis in original). As a result, and in the absence of any findings of fact by the Board regarding similarity of use, the trial court concluded, and properly so, that Inflection had not met its burden of proof (substantial evidence) with respect to subsection 12.18.1 of the Ordinance.

In reversing the trial court's decision, the Commonwealth Court, without explanation or citation, insisted that the record contained "detailed findings of fact." *Gorsline*, 123 A.3d at 1151. As noted, however, the Board's decision contained no findings of fact whatsoever with respect to similarity of use. The Commonwealth Court further maintained that the trial court, in reviewing Mr. Erwin's testimony, improperly acted as the factfinder and substituted its credibility determinations for those of the Board. *Id.* We must again respectfully disagree. The Board made no credibility determinations with respect to the two questions posed to Mr. Erwin regarding "public

service facilities," as it did not even mention this testimony in its opinion. Thus, there was no possibility of "substitution." The trial court likewise did not make any credibility determinations of its own, as instead it merely concluded that the contradictory nature of Mr. Erwin's testimony provided no "substantial evidence" to support the Board's conclusion that Inflection had satisfied its burden of proof with respect to subsection 12.18.1.[11]

The Commonwealth Court's reliance upon its decision in *MarkWest* was error. We take no issue with the distinction in *MarkWest*, based upon the language of the local ordinance at issue in that case, between substantially identical uses and uses that are

---

[11] Consistent with the Commonwealth Court, the learned Dissent insists that the trial court "inserted itself as the factfinder" by characterizing Mr. Erwin's testimony as "arguably inconsistent." Dissenting Op. at 4-5. Inconsistency aside, given Inflection's failure to develop a factual record regarding possible similarities between its proposed use and uses that are allowed in the R-A district, Mr. Erwin's conclusory answers at best amounted to unsupported lay opinion in response to leading questions that sought legal conclusions. As such, they lacked any evidentiary value with respect to similarity of use. The trial court explained its rejection of the testimony on this basis. 40 Pa.D&C.5d at 489 ("The definition of a public service facility was not discussed or alluded to and no testimony was provided to show how Inflection's proposed use fits the definition. There was just a bald, conclusion statement that the use fit the definition of a public service facility.").

The Dissent also lists other evidence in the record, including, inter alia, the project statement, an erosion and sediment control plan, an aerial photographic plat and Mr. Gillespie's testimony, as further support for the Board's decision. Dissenting Op. at 5. Conspicuously absent, however, is any reference by the Dissent to documentary evidence or testimony in these items of record that is relevant to the similarity of use issue. As noted above, for example, while Mr. Gillespie testified extensively at the second public hearing, he offered no testimony or other evidence relevant to the similarity of use issue.

Finally, I agree with the Dissent's recognition that in making land use decisions, municipal governing bodies should be permitted to bring to bear their expertise and knowledge of local conditions. Dissenting Op. at 5-6. They must do so on a sufficiently developed factual record, however, and their determinations with respect to questions of law (e.g., proposed uses) are subject to judicial review.

of the "same general character." *MarkWest*, 102 A.3d at 558-59. As explained herein, however, Inflection's proposed gas wells use is not, in any material respect, of the "same general character" as any allowed use in the R-A zoning district, including the "public service facility" and "essential services" uses referenced by the Commonwealth Court. *Gorsline*, 123 A.3d at 1152.

In summarily concluding to the contrary, the Commonwealth Court did not carefully examine the language of the two definitions. By its definitional terms, a "public service facility" involves "public service structures **by a utility** … or **by a municipality or other governmental agency**." Ordinance, § 2.2 (emphasis added). Likewise, "essential services" are the facilities and related equipment of a **"public utility."** *Id.* (emphasis added). Inflection is clearly not a municipality or a government agency, but rather is a private, for-profit commercial business. It is also not a public utility. In *Crown Communications*, this Court held that when a zoning ordinance (like the Ordinance at issue here) does not define "public utility," the term "shall be understood to mean any business activity regulated by a government agency in which the business is required by law to: 1) serve all members of the public upon reasonable request; 2) charge just and reasonable rates subject to review by a regulatory body; 3) file tariffs specifying all of its charges; and 4) modify or discontinue its service only with the approval of the regulatory agency. *Crown Communications*, 705 A.2d at 431–32; *see generally Robinson II*, 147 A.3d at 587. Unquestionably, Inflection's gas well operations do not satisfy any of these requirements.

Moreover, while Inflection now states that its proposed use will "serve the general public producing and piping natural gas to the public for their use and consumption,"

Inflection's Brief at 39, Inflection's use "for the general public" is materially different from the "public service facility" and "essential services" uses defined in the Ordinance. The word "public" in "**public** service facility" unquestionably refers to the local residents of Fairfield Township, as the definition of the term refers to, inter alia, power plants, water treatment plants, sewage disposal plants, and other similar public service structures, to furnish the public with "electrical, gas, communication, water supply and sewage disposal services." Ordinance, § 2.2. Likewise, the definition of "essential services" references gas, electrical communications, steam, fuel, or water transmission or distribution systems as are "necessary for the health, safety, and general welfare of the community." *Id.* As such, the public nature of "public service facility" and "essential services" uses is inherently **local** in nature – namely, to provide services for the benefit of residents in Fairfield Township's R-A district in connection with residential and agricultural uses in that district.[12] Inflection, conversely, while representing that it "serves the general public," offered no evidence, and the Board made no findings of

---

[12] In its brief filed with this Court, Inflection also argues that its gas wells use is similar to a "public or quasi-public use," which the Ordinance defines as follows:

> Uses or structures designed, intended or arranged for the use of service of the general public, although the fees and conditions of such use may be determined and regulated by the operator thereof, e.g., Banks, Post Offices, Churches, Cemeteries, Schools, Community Centers, Firehalls, Municipal building, Community Sewer and Water treatment facilities and other uses of the same general character.

Ordinance, § 2.2. As the uses set forth in this definition (e.g., banks, churches, schools) are clearly intended to be local in nature and for the benefit of the residents of Fairfield Township, we likewise reject Inflection's contention that this use is "similar to" its proposed gas wells use.

fact, that its extraction of natural gas is in any respect for the benefit of the residents of the R-A district, Fairfield Township, or even Lycoming County.

Fundamentally, the Ordinance was adopted "in consideration of the character of the municipality, its various parts and the suitability of the various parts for particular uses and structures," and its general purpose is to, inter alia, "encourage the most appropriate use of land, conserve and stabilize the value of property; provide adequate open spaces for light and air[.]" Ordinance, §§ 1.4.1; 1.4.2. This statement of purpose is echoed in the R-A zone definition, which reflects that such zones are meant to be quiet, of medium density, and supportive of residential and agricultural activities – while discouraging industrial uses. *See id.,* § 3.1. The Ordinance permits "public service facility" and "essential service" uses in the R-A district to promote residential and agricultural development in that part of the township. Ordinance, § 4.2.2.16. In other words, "public service facility" and "essential service" uses are allowed because they provide the necessary infrastructure for residential and agricultural development in the R-A district, including public utility services (water, sewage, electricity, natural gas, water treatment) as well as more general uses that support residential and agricultural development (e.g., hospitals, bed and breakfast inns, public recreation and agricultural businesses).

Seen in this light, Inflection's proposed use is plainly not of the "same general character as, or "similar to," "public service facility" or "essential services" uses. Inflection's proposed gas wells use provides no public or essential services to the residents of the R-A district, and provides no infrastructure that supports and promotes residential and agricultural development in Fairfield Township. Inflection's proposed

use is intended solely for Inflection's own commercial benefit, and not in any respect for the benefit of furthering the expressed goals of Fairfield Township's R-A district. It is not similar to a "public service facility" because it provides no public service to R-A residents, and it is not similar to "essential services" because it provides no services that are essential to residential and agricultural development in Fairfield Township.[13] Instead, it is a purely industrial use of the type the Ordinance expressly discourages in the R-A district.

Finally, the Commonwealth Court's reliance on the Board's prior grants of conditional use permits for other gas wells in an R-A district to satisfy subsection 12.18.1's requirement of similarity of use was also error. *Gorsline*, 123 A.3d at 1152 ("the Board has already authorized Inflection's other wells in the R-A District"). In this regard, we first note that the record in this case contains very little information about the previously permitted wells. Inflection's evidence regarding these other gas wells was limited to the following exchange between counsel for Inflection and Mr. Erwin:

> [Counsel for Inflection]: And you have received approval for other wells in that same zoning district in this Township?
>
> [Mr. Erwin]: Yes.
>
> [Counsel for Inflection]: Prior to this hearing?
>
> [Mr. Erwin]: Yes.
>
> [Counsel for Inflection]: And on how many occasions?

---

[13] *See Cellco P'ship v. N. Annville Twp. Zoning Hearing Bd.*, 939 A.2d 430, 435 (Pa. Commw. 2007) (rejecting Verizon's contention that construction of a cellphone tower was "similar to" a "public utility exemption" because it would "advance Verizon's ability to compete in a marketplace," and "there is an important difference between public and commercial benefits").

> [Mr. Erwin]: I believe it's at four wells now. The Greg Harris well, Mussina, and the two Eck wells.

N.T., 10/7/2013, at 19-20. There was no evidence presented about the proposed uses claimed for these wells; the permitted use(s) the Board found to be similar to those proposed uses; whether public hearings were held regarding these other wells; if there were public hearings, what evidence was presented, if any, in opposition to the proposed uses (and by whom); or any details about the wells themselves, e.g., their location, their proximity to residences, etc. A neighboring resident testified that the other wells were not similarly situated to the Shaheen Pad, as they were located a greater distance from residential areas. N.T., 11/4/2013, at 67. In summarily concluding that Inflection had satisfied its burden of proof with respect to subsection 12.18.1, the Board did not mention its prior grants of other conditional use permits for gas wells uses. To the contrary, its only reference to these permits in its opinion was to identify the above-noted difference in location between the previously permitted wells and the Shaheen Pad. *See* Board Op., Findings of Fact, ¶ 42 (noting that "of the proposed well pad sites proposed by [Inflection] to date within the Township, the proposed Shaheen Pad is the closest in distance to a significant number of single family residential homes").

We must agree with the arguments of the Objectors on this issue. Because the Ordinance does not expressly authorize a gas wells use in any of the Township's three zoning districts, such a use cannot enjoy any presumption of being "similar to" uses that are permitted in those districts, and section 12.18 clearly places the burden of proof with respect to similarity of use on the applicant. The statutory language of section 12.18 neither states nor suggests that the issuance of prior site-specific conditional use

permits under that section of the Ordinance relieves an applicant of its obligation to satisfy its burden of proof with respect to section 12.18 in its entirety. A contrary decision would effectively raise a prior ruling to the status of a zone-wide amendment of the language of section 12.18, and would deprive local residents and property owners in the district of any meaningful opportunity to oppose the issuance of a new conditional use permit. Inflection may not bootstrap its prior granted conditional use permits into a presumption of validity of every subsequent application that it files.

Applying our standard of review, we hold that the Board's conclusion that Inflection satisfied its burden of proving that its proposed use was similar to a permitted use in an R-A district is not supported by the record. In so ruling, this decision should not be misconstrued as an indication that oil and gas development is never permitted in residential/agricultural districts, or that it is fundamentally incompatible with residential or agricultural uses. As the Dissent fairly acknowledges, in *Robinson I* a plurality of this Court recognized that the protection of environmental values is a "quintessential local issue that must be tailored to local conditions." Dissenting Op. at 10 n.6 (quoting *Robinson I,* 83 A.3d at 979). To this end, the Municipalities Planning Code permits the governing body of a municipality to amend its zoning ordinances to permit oil and gas development in any or all of its zoning districts. 53 P.S. § 10601. The governing body must, however, actually amend its zoning ordinances to permit drilling in designated areas, setting forth whatever limitations and conditions it decides are appropriate for the protection of its citizenry. What a governing body may not do, however, and what the Fairfield Township Board of Supervisors did in this case, is to permit oil and gas development in residential/agricultural districts without first enacting the necessary

amendments, based upon a clearly inadequate evidentiary record and no meaningful interpretative analysis of the language of its existing zoning laws.[14]

For these reasons, we reverse the decision of the Commonwealth Court.

Chief Justice Saylor and Justices Todd and Wecht join the opinion.

Justice Dougherty files a dissenting opinion in which Justices Baer and Mundy join.

---

[14] Contrary to the Dissent's contention, we do not take the position that oil and gas drilling/development may never occur in a district unless a township amends its zoning ordinance to expressly allow the use, or that applicants may never seek a conditional use permit for this use pursuant to a local ordinance's savings clause. Where an applicant develops a sufficient evidentiary record to establish similarity of use, nothing prevents a local governing body from granting permission for a use not expressly allowed or disallowed in a particular district. Instead, we hold only that in the present case, given the stark differences between the proposed use and those uses expressly allowed in the R-A district (including "public service facilities" and "essential services") as well as Inflection's failure to even attempt to breach this divide through the development of a factual record, the Board erred in granting a conditional use permit under the Ordinance's savings clause.